**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven CARTER, Defendant–Appellant.**

**No. 89–3516.**

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1990.

Decided Aug. 23, 1990.

As Amended on Denial of Rehearing
Sept. 25, 1990.

---

David E. Bindi, Asst. Atty. Gen., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Matthew F. Kennelly, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., and RIPPLE, Circuit Judges, and CRABB, Chief District Judge.[1]

CRABB, Chief District Judge.

Defendant Steven Carter was charged in a two-count indictment under 18 U.S.C. § 2113(a) with robbing the Acme Continental Credit Union in Chicago on January 9, 1989 and again on January 20, 1989. The jury returned verdicts of guilty on both counts. Defendant was sentenced pursuant to the United States Sentencing Guidelines as a career offender to consecutive sentences of 240 months on Count I and 22 months on Count II. Defendant challenges his convictions, alleging pre-trial and trial errors, and he disputes the district court's classification of him as a career offender under the Sentencing Guidelines. We affirm defendant's convictions on both counts and we affirm the district court's sentence based on its determination that defendant is a career offender under the guidelines.

## I.  FACTUAL BACKGROUND

The evidence adduced at trial establishes the following facts.

On January 9, 1989, a robbery took place at the Chicago branch of the Acme Continental Credit Union, located on the fifth floor of the CNA Insurance building in Chicago. The robber gained access to the area behind the teller counter through an unlocked security door separating that area from the lobby, struck two of the tellers

---

1. The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

with his fist, grabbed cash from one of the cash drawers, and fled with $14,198.

On January 20, 1989, the same credit union was robbed in a manner similar to that on January 9. On this occasion, as the robber fled, he was chased by a man who saw him run into the stairwell. This person followed the robber out of the building and down the street, saw him get into a car, and noted the license number.

A trace on the license number established that the car belonged to defendant. He had purchased it with cash a few days after the first robbery.

Both the Chicago Police Department and the Federal Bureau of Investigation conducted investigations into these robberies. Joseph Doorley was the FBI agent assigned to the case. In late January or early February, Doorley learned that the Chicago Police Department planned to place a hold on defendant when he next reported to his parole officer in Chicago. Defendant was on parole from a prior conviction and was required to report to his parole officer on February 16, 1989.[2] Upon learning this, Doorley determined that he would wait to see whether the Chicago police would be able to arrest defendant on that date.

At approximately 2:30 p.m. on February 16, 1989, the Chicago police arrested defendant at the parole office. Although Doorley had planned to be at the parole office with the Chicago officers, he was unable to be there because he was out of town fulfilling a training obligation.

Defendant was brought to the police station about an hour after his arrest at the parole office, together with his fiance, Lashan Riggins, who was four months pregnant with his child. Upon arriving at the station, defendant was questioned briefly by Chicago Police Detective Steve Glynn and denied any involvement in either robbery. He was then placed in a lineup where he was identified by five of the credit union employees, by the man who chased him out of the building, and by another person who had seen him in the building on January 9.

Assistant State's Attorney Kathryn Gallanis arrived at the police station shortly after the lineup identifications. At 8:45 p.m., Gallanis and Glynn interviewed Lashan Riggins for fifteen minutes. The interview resulted in a written, signed statement. Next, Gallanis and Glynn questioned defendant. When they told him he had been identified, defendant confessed to both robberies. He asked that they tell his parole officer that he had cooperated. At 11:45 p.m., defendant read through written statements that Gallanis had prepared, made some corrections, and then signed them. Afterward, defendant was allowed to speak privately with Riggins for a few minutes before being taken to lockup. All told, approximately nine hours elapsed between defendant's arrest and his decision to confess.

The next morning, agent Doorley learned that defendant had been arrested by the Chicago police. Doorley had defendant transferred to federal custody.

Prior to trial, defendant filed a motion to suppress the confessions on the ground that they were involuntary because of the length of time he had been held in custody before being brought to a magistrate, and because they were coerced by the threat that his fiance would be charged with robbery if he did not confess.

At the hearing on this motion, Detective Glynn testified that defendant had asked about Riggins on three occasions while in custody. The first was during the initial questioning prior to the lineup. Defendant asked where Riggins was and Glynn responded that she was in an upstairs room and was fine. The second was after the lineup. Defendant asked whether Riggins would be charged with anything. Glynn told him that he did not know because the assistant state's attorney had not finished investigating her. However, Glynn admitted that he knew that the assistant state's

---

**2.** Evidence was introduced at trial that defendant had twice been convicted on charges of robbery, once in 1983 and again in 1985.

attorney had no intention of prosecuting Riggins at the time he made this statement. The third occasion occurred after defendant had confessed. Glynn told him that he soon would be allowed to speak with her privately.

Defendant testified at the hearing that Glynn told him three or four times between the first interview and the lineup that Riggins would be in trouble, and would have her baby in jail, if he did not confess. Also, according to defendant, after the lineup Glynn repeated that threat twice more. The second post-lineup threat was made right before defendant confessed. Defendant was told that Riggins would be charged unless he confessed. Defendant testified that at that point, his only concern was to get Riggins out.

Riggins testified that after she was brought to the police station, she was told by Glynn that she had been identified as a participant in a robbery, and that if she did not cooperate she would have her baby in jail. This threat was repeated at least once more. On cross-examination, she testified that when she spoke to defendant at the police station, he told her he confessed in order to get her out, but she admitted to previously telling an assistant United States attorney and an FBI agent that defendant confessed to her that he had committed the robberies.

The district court denied defendant's motion to suppress the confessions. It ruled that the delay in bringing defendant before a magistrate was a factor to be considered in determining the voluntariness of the confessions, but that it was not decisive for two reasons. First, the delay was justified by the need to complete the investigation: to determine whether the witnesses could make an identification, and, if so, to allow a period for interrogation of defendant. Second, assuming the delay was unnecessary, it had no measurable influence on defendant's decision to make the statements.

With respect to the alleged threats made to defendant regarding Riggins's fate, the court found that Glynn was telling the truth about his conversations with defendant about Riggins and that defendant was lying. Also, a finding was made that Riggins herself was not threatened. The court found that in Riggins's initial contact with Glynn, she was informed that a woman may have been involved in the second robbery, but that the statement was offered as information, not as a threat, and that it was made before Glynn reached his conclusion that Riggins was not involved.

## II. DISCUSSION

### A. Admissibility of Defendant's Confessions

Defendant argues that the district court erred in refusing to suppress his confessions because they were made after he was in custody for more than six hours, but before his presentment to a magistrate, in violation of his rights under *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), Fed.R.Crim.P. 5(a), and 18 U.S.C. § 3501(c). In the alternative, defendant argues that his confessions were inadmissible because they were induced by threats to have his pregnant fiance charged if he did not cooperate. Both of defendant's arguments are unavailing.

#### 1. Delay in Presentment

In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the Supreme Court ruled that once a defendant is arrested, he must be taken before a judicial officer without unnecessary delay for the purpose of having him advised of his rights and for a prompt determination of probable cause, and that failure to do so would result in suppression of any statements the defendant made while in custody.[3] In an effort to limit the effect of the *McNabb–Mallory* rule, Congress enacted

**3.** *McNabb* and *Mallory* were predicated on Fed. R.Crim.P. 5(a), which provides, in pertinent part, that "[a]n officer making an arrest ... shall take the arrested person without unneces-sary delay before the nearest available Federal magistrate" or, if one is not available, before a state or local judicial officer.

**1528**

18 U.S.C. § 3501. Subsection (a) provides that confessions given voluntarily are admissible, and subsection (b) lists several factors that are to be considered in determining voluntariness, including length of time in custody before presentment. Subsection (c) provides that delay in presentment alone shall not render inadmissible a confession made within six hours of arrest:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer ... if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501(c).

As a threshold matter, it must be determined whether the protections afforded by § 3501(c) or the *McNabb–Mallory* rule are available. This court has held that time spent in state custody does not count toward the six-hour limitation prescribed in § 3501(c) unless a working arrangement between federal agents and state or local officials can be "clearly shown." *See United States v. Gaines,* 555 F.2d 618, 622 (7th Cir.1977) ("[N]o court has ever determined that a 'bare suspicion' of a working arrangement between federal and local authorities is sufficient to make Rule 5(a) protections or a *McNabb–Mallory* argument available."). *See also United States v. Broadhead,* 413 F.2d 1351, 1359 (7th Cir.1969), *cert. denied,* 396 U.S. 1017, 90 S.Ct. 581, 24 L.Ed.2d 508 (1970). Additionally, the defendant has the burden of showing that state custody "was 'designingly utilized' [by state and federal officials] to circumvent Rule 5(a)." *Gaines,* 555 F.2d at 625 (citation omitted).

The facts establish that FBI agent Doorley was working in conjunction with the Chicago police on the robbery investigation and knew defendant would be arrested at the parole office on February 16, 1989. Doorley was not present during the arrest and subsequent investigation at the Chicago police station because of other responsibilities. Nevertheless, once Doorley learned of defendant's arrest and confessions, he had defendant transferred to federal custody.

Although it is clear from the record that the federal authorities were working with the Chicago police on the robbery investigation, defendant adduced no facts to suggest that the federal and local authorities had agreed to use local custody in order to circumvent the presentment requirements of § 3501(c) and *McNabb–Mallory.* Defendant did not show that Doorley refrained from participating in the arrest and subsequent interrogation so that a confession could be obtained without having to comply with federal presentment requirements. In the absence of a showing of this kind of collusion, § 3501(c) and *McNabb–Mallory* do not apply.

2. Voluntariness of the confessions

■ Defendant argues that the district court erred in its determination that his confessions were given voluntarily. He contends that his confessions were coerced because of detective Glynn's threats to have his fiance charged unless he cooperated. The district court disagreed.

> So the question really becomes ultimately whether or not Glynn said these things to Carter and whether or not he said these things to Riggins [regarding the prospect of being charged as an accomplice].

Having heard the testimony I find that he did not say them to Carter and I also find with one exception he did not say them to Riggins.

Factual determinations made by the trial court on a motion to suppress will be accepted on appeal unless they are clearly erroneous. *United States v. Oglesby,* 764 F.2d 1273, 1278 (7th Cir.1985). However, the ultimate issue of the voluntariness of a confession is a question of law, and as such is subject to *de novo* review. At the trial court level, the government must prove by a preponderance of the evidence that a confession is voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972). That is, the government must establish that the confession was "the product of a rational intellect and a free will," *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960), and that "defendant's will was [not] overborne at the time he confessed." *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963).

An examination of the trial court record reveals that the judge's factual findings were not clearly erroneous. Defendant can produce only his own testimony to support his allegations that Glynn threatened to charge Riggins if defendant did not confess. The trial judge did not believe defendant; rather, he accepted Glynn's testimony that no such threats were made. Such a credibility determination is not subject to reversal unless internal inconsistencies in the accepted testimony can be established. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses ... that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

■ Defendant argues that Glynn's testimony was internally inconsistent because of Riggins's testimony that she was threatened with possible prosecution, Glynn's statement that he did not know whether Riggins would be charged when in fact he knew that she would not be, and the fact that Riggins was not released after it had been decided that no charges would be brought against her. These elements do not jeopardize the internal consistency of Glynn's testimony. The trial judge found that Riggins was not telling the truth when she testified that Glynn had threatened her repeatedly with prosecution. The trial judge chose instead to believe Glynn's testimony. This kind of credibility determination is given great deference on appeal. *Id.*

Glynn's denial of having threatened defendant with the possibility of prosecuting Riggins is not contradicted by defendant's allegations that Glynn withheld information from defendant regarding Riggins's status by not answering defendant truthfully and by maintaining the impression that Riggins was still being held. However, these allegations do speak to the question whether defendant confessed voluntarily. The record indicates that Glynn told petitioner after the lineup that Glynn did not know whether Riggins would be charged when in fact he knew she would not be, and that Riggins was not told that she was free to go after she had signed her statement. These circumstances put into question whether defendant confessed with a "rational intellect and free will."

Despite the undercurrent of deceit these circumstances suggest, it seems implausible to conclude that defendant was led to believe that his fiance's fate depended on whether he confessed, in light of the trial court's findings that he was not threatened. Although Glynn did not eliminate defendant's fears that Riggins might be charged, he also did not indicate that cooperation on defendant's part would exonerate Riggins. A more probable interpretation is that defendant confessed with the hope of receiving lenient treatment for his cooperation. The record establishes that upon confessing, defendant asked that his parole officer be informed that he cooperated, not that Riggins be let free. In the totality of circumstances presented in the record, we hold that the district court acted properly in denying defendant's motion to suppress the confessions.

## B. Evidentiary Decisions

### 1. Testimony of Lashan Riggins

Defendant argues that the trial court improperly allowed the government to exceed the scope of direct examination when it cross-examined Lashan Riggins.

The government did not call Riggins as a witness in its case in chief. Defendant called her as a defense witness. On cross-examination, the government exceeded the scope of direct examination by inquiring into the following subjects: (1) defendant's statement to her that he committed the robberies, made to her in the holding room at the police station after he confessed to the authorities; (2) her recollection of the clothing defendant wore when he left Indianapolis for Chicago on January 20, 1989; and (3) her recognition of the clothing discarded following the January 9 robbery as similar to clothing owned by defendant. Defendant objected to these questions at trial on the ground that they were prohibited by Fed.R.Evid. 611(b), but in each instance the trial court invoked its discretion under the rule to permit the questions.

The district court did not act improperly in so ruling. Although Fed.R.Evid. 611(b) limits cross-examination to the subject matter of direct examination, it grants the trial court discretion to "permit inquiry into additional matters as if on direct examination." A district court's evidentiary rulings are not subject to reversal unless the defendant can show a clear abuse of discretion. *United States v. Mealy*, 851 F.2d 890, 898 (7th Cir.1988). Moreover, because the management of cross-examination is peculiarly committed to the district court's discretion, *United States v. Alvarez*, 833 F.2d 724, 729 (7th Cir.1987), "[t]he effect is to confine the matter largely to the trial level and to remove it from the area of profitable appellate review." *McCormick on Evidence*, § 24 n. 6 (3d ed.1984).

Despite this deferential appellate standard, defendant argues that the court's decision to allow Riggins to be questioned on such matters constitutes an abuse of discretion because it enabled the government to present evidence that it chose not to offer in its case in chief and that would not have been proper rebuttal. Although defendant is correct in these assertions, he must show more than this to establish that the trial court abused its discretion. The testimony elicited challenged some of the alibis that defendant was presenting, such as his contention that he was not at the CNA building on January 9, 1989 and that he was misidentified as the robber on January 20, 1989. In light of the probative value of this evidence, the trial judge did not abuse his discretion by allowing the government to exceed the scope of Riggins's direct examination.

### 2. Testimony of Brenda Perry

In response to Riggins's testimony on cross-examination, defendant sought to elicit from his mother, Brenda Perry, that she was with Riggins and defendant at the police station, and that she heard defendant say in front of her and Riggins that he confessed only to protect Riggins. This testimony was offered pursuant to the state-of-mind exception to the hearsay rule, Fed.R.Evid. 803(3), and as impeachment of Riggins by contradiction. The trial court sustained the government's objection. This ruling is subject to the "abuse of discretion" standard on review. *Mealy*, 851 F.2d at 898.

Fed.R.Evid. 803(3) allows for the admission of a statement that would otherwise be hearsay if it reflects the declarant's then existing state of mind. However, it does not include "a statement of memory or belief to prove the fact remembered or believed." For a statement to be admissible under this exception, three requirements must be satisfied: (1) the statement must be contemporaneous with the mental state sought to be proven; (2) it must be shown that declarant had no time to reflect, that is, no time to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case. *United States v. Jackson*, 780 F.2d 1305, 1315 (7th Cir.1986).

This exception does not apply to the facts of this case. It is undisputed that defendant made the statement to his mother and

Riggins at least an hour after he had confessed. Such a time period provided defendant with ample opportunity to reflect upon his situation. Accordingly, the requirement that defendant show that he made the statement without time to misrepresent his thoughts is not satisfied and the trial court's decision to exclude the statement on hearsay grounds was proper.

Defendant argues also that the statement should have been admitted because it would have impeached Riggins by contradiction. Riggins testified only to what defendant had told her when they were alone. Therefore, Perry could not have contradicted the testimony of Riggins directly. Although Perry's testimony may have shown that Riggins was mistaken in what she understood defendant to have told her in private, the trial court did not abuse its discretion by refusing to allow this statement into evidence.

### C. Improper Jury Instructions

The pattern alibi instruction for the Seventh Circuit provides:

> Evidence has been introduced that the defendant was not present at the time and place where the crime charged in the indictment is alleged to have been committed. The government has the burden of establishing beyond a reasonable doubt the defendant's presence at that time and place.

Federal Criminal Jury Instructions of the Seventh Circuit, Volume I, § 4.03 (1980). The district court gave this instruction in modified form, reasoning that defendant had presented an alibi defense with respect to Count I (January 9 robbery), but that his impeachment of the eyewitnesses to the January 20 robbery (Count II) did not constitute an alibi. The modified instruction was given over defendant's objection. It provided that there was evidence that defendant was not present at the time and place "where one of the crimes charged in the indictment is alleged to have been committed." Defendant claims that this in-

struction slighted his defense to Count II, and was inadequate to inform the jury of his theory of defense.

A defendant in a criminal trial is entitled to have the jury consider any theory of defense that is supported by law and that has some foundation in the evidence. *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir.1969). On review of a challenge to the sufficiency of the jury instructions, the question is not the correctness of a single phrase, but whether the instructions as a whole were sufficient to inform the jury correctly of the applicable law and the theory of defense. *United States v. Alexander*, 743 F.2d 472, 478 (7th Cir. 1984). The absence of an alibi instruction where it is arguable that one should have been given is not reversible if the charge as a whole required the government to prove the defendant's presence at the time and place of the offense beyond a reasonable doubt. *Alicea v. Gagnon*, 675 F.2d 913, 926 (7th Cir.1982).

The trial court did not commit reversible error in giving the instructions it did. It instructed the jury correctly regarding the presumption of innocence, the burden of proof, and the elements of the offenses, including the need to prove that defendant was present and committed the acts constituting the crime. Moreover, with respect to defendant's theory of defense, the court instructed the jury that

> it is the defendant's theory of the case that while he was identified as being on Van Buren Street at or about the time the robbery occurred on January 20th, 1989, he was mistakenly identified as having been the same man who had robbed the credit union.

The instructions as a whole were sufficient to instruct the jury of the applicable law and the theory of defense.

### D. "Career Offender" Under the Sentencing Guidelines

The district court found defendant to be a "career offender" under § 4B1.1 of the Sentencing Guidelines. Under that provision, a defendant is a career offender if he was at least 18 years old at the time of

the offense for which he is being sentenced, is being sentenced for a "crime of violence," and has at least two prior felony convictions for "crimes of violence."

The district court based its finding upon defendant's prior state convictions for robbery. Under Guideline § 4B1.1, the result of the career offender finding was to classify defendant as a Category VI offender and to classify the credit union robberies as Level 32 offenses. The district court sentenced defendant to 262 months' incarceration, the maximum under the applicable guideline range. Absent application of the career offender provision, but still taking into account defendant's prior criminal history, the appropriate sentencing range would have been 92 to 115 months.[4]

Defendant argues that the district court committed reversible error because the record does not establish that force was actually used in more than one of the robberies for which he was convicted in state court; thus, one of his two prior felony convictions does not represent a "crime of violence."

The guidelines define a "crime of violence" as follows:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16; Guidelines § 4B1.2(1). Under Illinois law, robbery qualifies under this definition because it is defined as the taking of property "by the use of force or by threatening the imminent use of force." *Ill.Rev.Stat.* ch. 38, par. 18–1(a). It is beyond dispute that under Illinois law, robbery is an offense that has as an element the use or threatened use of force. Moreover, the Commentary to § 4B1.2 lists robbery specifically as an example of a crime of violence. *See* Commentary Application

Notes to Sentencing Guidelines 4B1.2(1) at 1.

Defendant argues that it is improper in determining whether an individual is a "career offender" under the guidelines not to look to the facts underlying the prior offenses to ascertain whether they were in fact "crimes of violence." In other words, defendant contends that a judge's sole reliance on the statutory definitions of a defendant's prior offenses is insufficient when determining whether those offenses qualify as crimes of violence.

Defendant cites our recent decision in *United States v. Terry*, 900 F.2d 1039 (7th Cir.1990) in support of this argument. Defendant's reliance on *Terry* is misplaced. In *Terry* the issue was whether the trial court erred in deciding that Terry's prior conviction for aggravated battery was not a crime of violence based on facts relating to that conviction brought out at sentencing. The government argued that because the statutory definition of aggravated battery contained an element of physical violence, the court was bound to consider it as a crime of violence under the career offender provision.

We disagreed. Based on the fact that the Commentary to § 4B1.2 did not list aggravated battery as a crime of violence, we determined that a sentencing judge has the discretion to examine the underlying facts of a prior offense not included in that list.

We read this note as vesting a sentencing court with the discretion to explore the underlying facts of a prior conviction when that conviction is for a crime that is not one of the crimes specifically enumerated in the application note.

*Id.* at 1042. This conclusion was bolstered by the Commentary to § 1B1.3(b), which provides that "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into a determination of the applicable sentencing range."

---

**4.** Absent application of the career offender provision, defendant would have been classified as a Category IV offender and the offense would

have been classified as a level 26 offense at a maximum. This would have resulted in an applicable sentencing range of 92 to 115 months.

In *Terry* we did not hold that a sentencing judge has the *duty* to review the underlying facts of a prior conviction to determine whether it was in fact a crime involving violence. Rather, *Terry* holds that a court has the *discretion* to look beyond the statutory definition of a prior conviction to determine whether it qualifies as a crime of violence if that offense is not enumerated in the application note to the Commentary under § 4B1.2 [5]. Moreover, for present purposes, we need state only that *Terry* does not require a sentencing judge to explore the underlying facts of a prior conviction that is identified as a crime of violence in the Commentary to § 4B1.2.[6] Accordingly, the district court did not commit reversible error when it classified defendant as a career offender without looking at the facts upon which his prior convictions for robbery were based. *Accord United States v. Selfa,* No. 89–10309, slip op. at 2 (9th Cir. June 14, 1990) ("We conclude that the elements of the crimes of which the defendant was previously convicted [robbery under 18 U.S.C. § 2113(a) ], and not the particular conduct of the defendant on the day the crimes were committed, should control.").

AFFIRMED.

---

5. We did not have occasion in *Terry* to consider whether a court has discretion to examine the underlying facts of a prior conviction for a crime listed in the application note under § 4B1.2 as a crime of violence to determine whether violence or the threat of violence was present in fact. Although we do not entertain this question here, we note that other circuits have found it permissible to look to the underlying facts of prior convictions to determine whether violence was involved even though such convictions were for crimes enumerated in the Commentary as crimes of violence. *See United States v. McVicar,* 907 F.2d 1 (1st Cir. 1990); *United States v. Maddalena,* 893 F.2d 815, 820 (6th Cir.1989); *United States v. Baskin,* 886 F.2d 383, 389 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

6. Defendant argues that *Terry* should be read more broadly in light of its citation to *United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989), for the proposition that other courts have held that a sentencing court may examine the underlying facts of a particular conviction in career offender cases.

*Baskin* is particularly relevant to the facts of this case because the predicate felony at issue was a robbery under the same Illinois statute involved here. In *Baskin,* the defendant argued that his conviction for robbery was not a crime of violence and at the sentencing the judge admitted that but for the guidelines, he would impose a lighter sentence. On appeal, the Court of Appeals for the District of Columbia remanded the sentence for consideration of the facts underlying Baskin's prior robbery conviction to determine whether the offense in fact involved the use or threatened use of violence. In reaching this conclusion, the court emphasized that a judge's decision to review the underlying facts was discretionary, but that a remand was proper in light of the sentencing judge's expressed belief that such a long sentence was not warranted.

> Judge Harris apparently believed that he did not have discretion to review the facts and depart from the guidelines but that if he could he would. A sentencing judge retains *discretion* to examine the facts of a predicate crime to determine whether it was a crime of violence notwithstanding the Commentary to the guidelines' predetermined list of crimes which it considers to be crimes of violence.

*Id.* at 389 (emphasis added).

We do not reach the issue whether *Terry's* citation to *Baskin* implies that a sentencing judge has the discretion to examine the underlying facts of an offense included in the Commentary's list. This is not the issue defendant raises here. What should be noted is that both *Terry* and *Baskin* emphasize that a sentencing judge is under no obligation to examine the facts associated with a predicate offense enumerated on the Commentary's list, and, therefore, the district judge in this case did not commit reversible error by not considering the circumstances surrounding defendant's two prior robbery convictions.