**In re FBN FOOD SERVICES, INC., Debtor.**

**James E. CARMEL, Trustee, Plaintiff,**

v.

**RIVER BANK AMERICA, a New York Banking Corporation, et al., Defendants.**

**No. 95 C 366.**

United States District Court, N.D. Illinois, Eastern Division.

July 17, 1995.

Louis W. Levit, Ross & Hardies, P.C., Chicago, IL, for River Bank America.

John K. Kneafsey, Nisen & Elliott, Chicago, IL, for James E. Carmel.

### MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

The bankruptcy court below found that appellant River Bank America ("River Bank") had received a fraudulent conveyance of $1.4 million from the debtor FBN Food Services, Inc. ("FBN"). The court avoided the $1.4 million transfer and granted Trustee James Carmel's ("Trustee") request to recover the funds, plus prejudgment and postjudgment interest. River Bank appeals that decision, arguing (1) that the transferred funds were never "property of the debtor," (2) that River Bank was not shown to have committed actual or constructive fraud, and (3) that, in any event, the Trustee should not

be entitled to recover more than the total amount of legitimate claims filed in the bankruptcy court. We affirm the decision of the bankruptcy court in all respects.

## I. Background [1]

The underlying bankruptcy proceeding arises out of the operation of Sizzler restaurant franchises by FBN, Midwest Restaurant Concepts ("MRC"), and SIG Food Services Associates ("SFSA"). All three companies were owned by the same entities: SIG Partners, Quest Equities Corporation ("Quest Equities") and Anthony Basile.[2] Quest Equities was a wholly owned subsidiary of appellant River Bank, and SIG Partners was a New York general partnership owned by Stuart Seigel, Irwin Cohen and Gerald Kaufman. Basile, president of FBN, was responsible for the operation of FBN's Sizzler restaurant franchises, and, along with Kaufman, had personally guaranteed FBN's obligations to Sizzler.

MRC leased the restaurant facilities and fixtures directly from Sizzler, and its obligations under these leases were guaranteed by FBN, Basile and Kaufman. In contrast, FBN leased its restaurant facilities and fixtures from SFSA. In order to acquire these hard assets, SFSA obtained a $7.5 million unsecured loan from River Bank ("River Bank Loan") in 1987, as well as a $100,000 loan from Basile.[3] An additional $6.5 million loan was acquired from American National Bank & Trust Company of Chicago ("ANB") in 1988; however, in order to secure this financing River Bank was required to subordinate the River Bank Loan to ANB pursuant to an intercreditor agreement.

Soon after receiving the initial River Bank Loan, SFSA defaulted. River Bank's president Avrum Waxman sought the help of financiers William Landberg and Stephen Mann to assist in the refinancing of the River Bank

Loan. Waxman also told Basile that if he helped Landberg successfully secure refinancing, River Bank would forgive Basile's $100,000 promissory note to Quest Equities. These efforts at refinancing continued until late 1990, when Landberg finally guaranteed repayment of a $1 million loan made by World Life & Health Insurance Company of Penna to SFSA. In exchange, Quest Equities handed over to Landberg its interest in SFSA, FBN, and all the related entities.

In April 1989, ANB loaned an additional $4 million to MRC in order for it to purchase additional Sizzler restaurants and franchises. Although this loan was partially secured by a mortgage on the restaurants, ANB also required Sizzler to buy back MRC's assets should the company default on the loan. In the event of such a default, MRC, FBN, Basile, Kaufman and others agreed to be liable to Sizzler for repayment.

The operations of FBN and MRC did not flourish, and their relationship with Sizzler quickly began to sour. In February 1990 FBN and MRC filed an action in federal district court in Chicago ("FBN Litigation"), alleging that they were being treated differently from other franchisees and that they had been induced by Sizzler's misrepresentations and fraudulent conduct into signing the franchise agreements. Sizzler counterclaimed against FBN for breach of the franchise agreement, and included as counterdefendants Quest Equities, SFSA, Kaufman and Basile under an "alter ego" theory of liability. By June 1990, both FBN and MRC had closed their restaurants and became insolvent. After Sizzler was forced to buy back several of MRC's restaurants for the benefit of ANB, Sizzler initiated an arbitration action against MRC in California to recoup these and other alleged losses ("MRC Arbitration").[4] Although MRC counter-

---

1. This lengthy discussion of the facts is derived primarily from the opinion of bankruptcy court. *Carmel v. River Bank America (In re FBN Food Services, Inc.)*, 175 B.R. 671 (Bankr.N.D.Ill. 1994). Where appropriate, citation to the trial transcript is indicated by "Trans. ___."

2. Although SFSA had an additional shareholder, that entity held only 1% of the outstanding shares of SFSA. A more detailed description of the ownership interests in these companies can be

found in the bankruptcy court opinion. 175 B.R. at 676, 692.

3. Basile, in turn, had borrowed the $100,000 from Quest Equities and executed a promissory note in exchange.

4. With the commencement of the California arbitration proceedings, MRC was dismissed as a plaintiff from the FBN Litigation and its claims were moved to the arbitration.

claimed against Sizzler in the arbitration, these claims were of questionable validity.[5]

In an effort to resolve both the FBN Litigation and the MRC Arbitration, a mediation conference between the parties was held in Chicago on September 16–17, 1990. Present at the mediation for Sizzler was Thomas Gregory,[6] the company's chief executive officer, and two of its attorneys, David Kenagy and William Beynon. FBN was represented by Basile, Kaufman[7] and FBN's attorney, Nicholas Etten. Although River Bank and Quest Equities had previously transferred their interests in FBN, the two corporations were also represented at the mediation by Waxman, Mann and Stahl. During the mediation presentations were made by FBN and Sizzler, but at no time were presentations made by Quest Equities or River Bank, nor were any claims by the two companies raised. 175 B.R. at 679. After two days of intense bargaining, during which time the Sizzler contingent was placed in a separate room from the FBN–MRC–River Bank–Quest Equities group, a deal was reached. Sizzler agreed to pay a lump sum of $4,175,000, in exchange for the dismissal of all claims in the FBN Litigation and the MRC Arbitration, and the transfer of two parcels of real estate from SFSA to Sizzler. Although Sizzler was only concerned about the final dollar amount and the dismissal of all pending claims, the representatives of FBN and River Bank soon became embroiled in a heated disagreement about how to distribute the settlement proceeds. Waxman insisted that, because River Bank was owed approximately $8 million by FBN, it should receive the lion's share of the settlement funds. 175 B.R. at 689–90. In addition, Waxman demanded that the distribution of the settlement funds be reduced to a Settlement Agreement before any of the parties left the mediation. The agreement that the parties drafted that evening divided the settlement proceeds according to the following formula: $250,000 to FBN, $1,800,000 to SFSA,[8] $625,000 to River Bank,[9] and $1,500,000 to Quest Equities.[10] Basile objected to any payment of FBN's funds to Quest Equities, but Waxman warned that Quest Equities would revive the previously forgiven $100,000 promissory note Basile had signed if he did not agree to the distribution. Basile was also pressured by Kaufman, who had personally guaranteed almost $9 million in loans to FBN and MRC, to sign the Settlement Agreement. Basile eventually signed the Settlement Agreement, as did representatives of all the other relevant parties.[11]

After receiving releases from all the parties involved in the FBN Litigation and MRC Arbitration, Sizzler paid out the settlement proceeds to FBN, SFSA, River Bank and Quest Equities. Although Quest Equities was to be paid $1.5 million, the payment from Sizzler was deposited into a River Bank account. After deducting $100,000 for the payment of FBN's legal expenses, River Bank then applied the remaining $1.4 million to-

---

**5.** Basile believed that MRC had a very weak position in the arbitration, and that its liability to Sizzler was clear cut. Trans. 336–338. Philip Stahl, counsel for River Bank and Quest Equities, agreed that MRC would get "creamed" in the arbitration. Trans. 1785.

**6.** The bankruptcy court found Gregory to be "especially credible," given that he was a disinterested witness and testified in a forthright manner. 175 B.R. at 678 n. 12.

**7.** Although Kaufman putatively represented FBN and SIG Partners, he also was on the hook to River Bank for approximately $8 to $9 million in guarantees, and thus had a personal interest in resolving the asserted claims. 175 B.R. at 678–79.

**8.** This figure was divided into $1.5 million for the purchase of the two parcels of real estate, and $300,000 to repay SFSA for an outstanding loan made to FBN.

**9.** This amount was intended to offset a $625,000 loan made to SFSA, which in turn had been lent to FBN.

**10.** This amount was further divided in $100,000 for the payment of FBN's legal fees, and $1,400,000 to pay down the River Bank Loan.

**11.** Soon afterwards Waxman also demanded an additional $250,000 from SIG Partners to pay down the River Bank Loan, and a "side agreement" was entered into by Kaufman, Cohen and Seigel, whereby they agreed to execute a promissory note to River Bank for that amount. However, that agreement was contingent on ANB's approval, which was never given.

ward the principal amount of the River Bank Loan to SFSA.[12]

Upon learning of the crediting of the River Bank Loan, ANB brought suit against River Bank for breach of the intercreditor agreement. In particular, ANB alleged that the $1.4 million credit violated River Bank's agreement to subordinate the River Bank Loan to ANB's loan. The parties eventually settled the dispute in 1991, whereby River Bank agreed to transfer its $7.5 million mortgage note to ANB, acknowledge that it had credited the River Bank Loan with the $1.4 million payment, and reverse the credit.

In the meantime, FBN was forced into a Chapter 7 bankruptcy by three of its other creditors. On July 9, 1992, the Trustee filed this adversary proceeding against River Bank, Quest Equities and Quest Realty, seeking to avoid and recover the $1.4 million transfer. After hearing three weeks of evidence and reviewing post-trial memoranda, the bankruptcy court avoided the $1.4 million transfer as a fraudulent conveyance and ordered River Bank to return the funds to the debtor.

## II. Discussion

■ Appellant raises several objections to the factual and legal conclusions of the bankruptcy court. We review the factual findings of the court below for clear error, and its legal conclusions *de novo*. Fed.R.Bankr.P. 8013; *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir.1994). The primary focus of this appeal is the proper interpretation of 11 U.S.C. § 548(a)[13] and its applicability to the $1.4 million transfer at issue.

### A. Transfer of an Interest of the Debtor in Property

Appellant first attacks the bankruptcy court's conclusion that the $1.4 million payment from Sizzler to River Bank effected a "transfer of an interest of the debtor in property." 11 U.S.C. § 548(a). Essentially, River Bank argues that FBN had neither possession nor control over the $1.4 million at any time, and therefore it never had an interest in the money sufficient to invoke the fraudulent conveyance provision of the Code. *See Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181–82 (11th Cir.1987) (holding that funds of debtor's president that were placed in the debtor's accounts were not "property of the debtor"). The Trustee, although conceding that FBN did not directly pay the $1.4 million to River Bank, contends that the payment to be avoided is not the check from Sizzler to River Bank, but rather, the indirect transfer of value from FBN to River Bank.[14] The bankruptcy court concurred in the Trustee's analysis, and found that although FBN had released its claims against Sizzler in exchange for the $1.4 million, River Bank coerced Basile and FBN into allowing these funds to be paid to River Bank. 175 B.R. at 683–84.

■ We begin our analysis by examining whether the bankruptcy court correctly characterized the transactions at issue as "transfers." The determination as to what constitutes a transfer under Section 548 is a

---

**12.** Technically, the credit went to the account of Quest Realty Corporation, a wholly-owned subsidiary of Quest Holding Corporation, which itself was wholly-owned by River Bank. 175 B.R. at 681.

**13.** This portion of the Bankruptcy Code provides, in pertinent part, that:

[t]he trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that

such transfer was made or such obligation incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer; . . . .

11 U.S.C. § 548(a). The parties do not dispute that the transfer at issue occurred within one year of the filing of FBN's involuntary petition for bankruptcy.

**14.** More accurately, appellee seeks to avoid the transfer from FBN to *Quest Equities*. However, appellant does not challenge the finding of the bankruptcy court that the money paid to Quest Equities actually benefited River Bank.

question of federal law. *See Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992). The Code defines transfers to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54).[15] Congress intended the term "transfer" to be construed as broadly as possible. *Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1492 (5th Cir.) (quoting S.Rep. No. 95–989, 95th Cong.2d Sess. 27 (1978); H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 314 (1977)), *cert. denied,* —— U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). As the bankruptcy court correctly observed, "a transfer does not have to be made directly by a debtor" in order to fall within the ambit of the statute. 175 B.R. at 683; *see Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.),* 831 F.2d 586, 591–94 (5th Cir.1987), *reh'g,* 835 F.2d 584 (5th Cir.1988); *Virginia Nat'l Bank v. Woodson (In re Decker),* 329 F.2d 836 (4th Cir.1964). In this case, the alleged transfer involved two separate transactions: (1) the release of FBN's rights against Sizzler and (2) the payment of $1.4 million to River Bank. We agree with the court below that, given the expansive interpretation mandated by the Code, the transactions at issue in this case constituted a "transfer." *Cf. In re Besing,* 981 F.2d at 1492–93 (construing dismissal of debtor's claim by state court as "transfer" under Code).[16]

 River Bank contends that this characterization of the alleged fraudulent conveyance was not supported by the evidence. Appellant argues that part one of the transaction—FBN's release of its claims against Sizzler—was speculative at best, since FBN had limited assets and would have had trouble prosecuting its claims regardless of their merit. River Bank also raises the possibility that Sizzler paid the $1.4 million in exchange for releases from Quest Equities and River Bank, or to compromise MRC's claims. At bottom, appellant seeks to challenge the factual finding of the bankruptcy court that Sizzler paid all of the settlement funds for the sole purpose of resolving FBN's claims. 175 B.R. at 685. However, this finding will only be disturbed if it is shown to be clearly erroneous.

> A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.... Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Peterson v. Akrabawi (In re Stotler and Co.),* 166 B.R. 114, 117 (N.D.Ill.1994).[17] As discussed in the bankruptcy court's opinion, Sizzler's chief executive officer stated that during the mediation his company was concerned only with the total dollar amount of the settlement and the dismissal of both the FBN Litigation and the MRC Arbitration. However, because Sizzler had already taken all of MRC's assets, and had strong breach of contract claims against MRC, it saw no reason to pay money in order to settle the MRC Arbitration. Indeed, the settlement agreement does not provide for any payments to MRC, and counsel for River Bank and Quest Equities agreed

---

15. Due to a numbering error in Pub.L. 101–647 (Crime Control Act of 1990), 11 U.S.C. § 101 currently contains two sections numbered (54). Nonetheless, we shall refer to the term "transfer" as being codified at § 101(54).

16. Although River Bank argues that the bankruptcy court was inconsistent in its characterization of the transfers at issue, appellant misapprehends the opinion of the court below. The transfers were clearly outlined by the bankruptcy court, and any confusion concerning them stemmed from the complicated nature of the transactions themselves.

17. River Bank seeks to avoid this deferential standard of review by arguing that the these issues involve mixed questions of law and fact, or that they deal with the proper interpretation of the Bankruptcy Code. Not so. The bankruptcy court correctly applied the proper legal standard for determining whether an interest of the debtor was transferred, and thus our review of the bankruptcy court's factual conclusions is not plenary. *Cf. Edgewater Walk Apartments v. Mony Life Ins. Co.,* 162 B.R. 490, 497 n. 14 (N.D.Ill.1993) (*de novo* review of factual findings appropriate only where incorrect legal standard applied, or correct standard is misapplied).

that MRC had no chance of succeeding in the arbitration. Furthermore, during the mediation it is clear that FBN and Sizzler were the only real parties negotiating the settlement amount, and the other representatives only altered the agreement after a total dollar amount was reached. In sum, we are not left with the firm conviction that the bankruptcy court mistakenly found that the entire settlement amount was intended to resolve the claims of FBN, and was not (as argued by appellant) offered in exchange for River Bank's signature on the Settlement Agreement or the release of MRC's claims.[18]

■■■ We next review the lower court's conclusion that the transfer at issue was of "an interest of the debtor in property." Although the term "property" is defined by reference to federal law, a determination of the debtor's legal or equitable interest in such property must be made according to state law. *See Barnhill,* 503 U.S. at 397, 112 S.Ct. at 1389; *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993). The Code defines property of the debtor's estate to include "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). Without doubt, causes of action and claims possessed by the debtor are property of the estate. *See In re Geise,* 992 F.2d 651, 655 (7th Cir.1993). Illinois law is in accord. *See In re Marriage of Burt,* 144 Ill.App.3d 177, 98 Ill.Dec. 746, 747, 494 N.E.2d 868, 869 (1986). Moreover, the fact that such property is converted into another form does not necessarily remove it from the estate. 11 U.S.C. § 541(a)(6); *see Unsecured Creditors Comm. v. Prince (In re Prince),* 127 B.R. 187, 189 (N.D.Ill.1991). In this case, the property at issue consisted of FBN's claims against Sizzler, which FBN converted into a total cash payment of $4,175,000. All of this money went to benefit FBN, except for the $1.4 million payment to River Bank and the $1.5 million payment to SFSA for two parcels of real estate. Notwithstanding the fact that FBN did not write the check to River Bank or exercise control over the funds, this money was properly considered by the bankruptcy court to be "property" of the debtor.

Appellant's citation to *In re Chase & Sanborn Corp.* is unavailing. In that case, the funds in question came from the debtor's president, and were only passed in and out of the debtor's bank accounts in order to facilitate a money laundering scheme. The Eleventh Circuit refused to hold that such funds were property of the debtor because the debtor never had the right to control their disbursement, and thus their transfer out of the debtor's accounts did not actually deplete the assets of the estate. 813 F.2d at 1181–82 (characterizing connection between funds and debtor as "quite tangential"). By contrast, the funds in the instant case were exchanged for the release of claims owned by the debtor, and thus these proceeds had an undeniably strong nexus to the debtor. The fact that FBN did not actually cut the check that River Bank deposited into its own account does not undermine the bankruptcy court's conclusion that the debtor actually had an interest in the property. *Cf. Bowers–Siemon Chemicals Co. v. H.L. Blachford, Ltd. (In re Bowers–Siemon Chemicals Co.),* 139 B.R. 436, 443 (Bankr.N.D.Ill.1992) (distinguishing *In re Chase & Sanborn Corp.*).

■■■ Finally, appellant challenges a number of the bankruptcy court's evidentiary rulings. In order to prevail on these objections, however, River Bank must overcome the heavy burden of demonstrating that the bankruptcy court abused its discretion in excluding the evidence. *Thompson v. Boggs,* 33 F.3d 847, 854 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995). "[T]he abuse of discretion standard is met only when the trial judge's 'decision is based on an erroneous

---

18. In support of its contention that it gave value in exchange for the $1.4 million, appellant points to Sizzler's demand to have all the principals of FBN sign the settlement agreement. River Bank then asserts that it would not have given its approval if it had not received these funds. However, the demand by Sizzler for unanimity is not inconsistent with the bankruptcy court's conclusion, since in order to definitively settle the FBN Litigation Sizzler wanted to obtain releases from all of FBN's principals. The court found that River Bank, as parent of Quest Equities, was included on that list because of its potential control over FBN, not because of any independent claims River Bank may have had. Given the evidence adduced at trial, this conclusion is not clearly erroneous.

conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous.'" *Wheeler v. Sims,* 951 F.2d 796, 802 (7th Cir.) (quoting *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 563–64 (7th Cir.1984)), *cert. denied,* —— U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 241 (1992). Appellant first contends that the court improperly excluded testimony from Stahl (counsel for River Bank and Quest Equities) about statements made by Kenagy (Sizzler's counsel) concerning Sizzler's desire to have River Bank participate in the mediation. The court excluded these statements because Kenagy was never included on the witness list and was never deposed by River Bank, even though it knew of the potential relevance of his testimony for some time. Appellant argues that these statements should have been admitted as evidence of the declarant's state of mind under Fed.R.Evid. 803(3), regardless of Kenagy's unavailability. At the outset, we observe that these alleged statements by Kenagy do not strike us as the sort of declarations that should be admissible under the "state of mind" exception. First, it is unclear whether they refer to Kenagy's or Sizzler's state of mind; the former is irrelevant, and we question whether Kenagy's statements can be used as evidence of the later. Second, the alleged statements were made in the course of an ongoing negotiation, and thus do not bear the same mark of reliability as do traditional "state of mind" declarations.

Regardless, the failure to admit these statements into evidence does not amount to anything more than harmless error. As discussed above, River Bank's contention that Sizzler wanted River Bank and Quest Equities at the mediation does not undermine the bankruptcy court's conclusion that the deal was really between FBN and Sizzler. Sizzler wanted to insure that all of FBN's principals agreed to any settlement, and River Bank, as the sole shareholder of Quest Equities, appeared to fall into that category. Because the admission of this evidence would not have rendered the bankruptcy court's finding clearly erroneous, we must reject River Bank's first evidentiary objection.

■ Appellant also contends that the bankruptcy court improperly limited the cross-examination of Nicholas Etten, FBN's attorney. In particular, River Bank was not permitted to ask Etten about potential claims River Bank might have had against Sizzler, since on direct examination Etten only testified that no claims by Quest Equities were ever made known to him. The bankruptcy court was permitted to limit cross-examination "to the subject matter of the direct examination and matters effecting the credibility of the witness." Fed.R.Evid. 611(b). "[B]ecause the management of cross-examination is peculiarly committed to the [trial] court's discretion, the effect is to confine the matter largely to the trial level and to remove it from the areas of profitable appellate review." *United States v. Carter,* 910 F.2d 1524, 1530 (7th Cir.1990) (citations and quotations omitted), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). In this instant case, Etten was called only for the limited purpose of rebutting Stahl's statement that he had discussed with Etten the possibility of Quest Equities raising claims against Sizzler. On direct examination Etten denied that such conversations occurred. Thus, counsel's attempt to delve into other potential claims by other parties was arguably outside the subject matter of the direct examination. Even if we were inclined to find that the bankruptcy court exceeded its discretion (which we are not), such a mistake would amount to nothing more than harmless error, since the findings of the court would still not be clearly erroneous. Accordingly, having found no abuse of discretion, or prejudice resulting from the alleged error, we reject River Bank's evidentiary arguments.

In sum, we agree with the bankruptcy court that the transaction at issue, although not a common method means of conveying property of the debtor, constituted a transfer of an interest of FBN in property. As such, it satisfied the first element of a fraudulent conveyance.

### B. Actual Intent to Defraud

■ Appellant next attacks the finding of the bankruptcy court that the transac-

tion was undertaken with the actual intent to defraud. Under Section 548(a)(1), the trustee must demonstrate that the transfer in question was made "with actual intent to hinder, delay, or defraud" any creditor. A determination of actual intent to defraud requires a case-by-case, individualized analysis of the intent of the debtor. *See Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987). "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of the case." *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985). Some of the most common indicators of fraudulent intent have been classified into "badges of fraud," the existence of which can be used to infer the actual intent to defraud. *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991). These badges of fraud include (1) the absconding with the proceeds of the transfer immediately after their receipt, (2) the absence of consideration when the transferor and transferee know that outstanding creditors will not be paid, (3) the huge disparity in value between the property transferred and the consideration received, (4) the fact that the transferee was an officer, or an agent or creditor of an officer of an embarrassed corporate transferor, (5) the insolvency of the debtor, and (6) the existence of a special relationship between the debtor and the transferee. 4 *Collier on Bankruptcy* ¶ 548.02[5], at 548–41 to 548–46 (15th ed. 1994); *A.D.B. Investors*, 926 F.2d at 1254.

Although Section 548(a)(1) speaks only of the intent of the debtor, if the transferee dominates the debtor then the fraudulent intent of the transferee may be imputed to the debtor. *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir.1983); *Estate of Klein v. Klein (In re Klein)*, Nos. 86 B 19937, 88 A 357, 1991 WL 242169, at *8 (Bankr.N.D.Ill. June 21, 1991); 3 *Norton Bankruptcy Law and Practice 2d.* § 58:3, at 58–10 nn. 38–39 (1994).

As the bankruptcy court applied the proper legal standard for determining whether actual intent to defraud existed, we review its findings for clear error. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805 (9th Cir.1994); 4 *Collier on Bankruptcy* ¶ 548.02[5], at 548–49 n. 62 ("A finding of a trial judge ... who has heard the oral testimony that a transfer has or has not been effected with actual fraudulent intent, is undoubtedly entitled to great weight on appeal in view of the particular importance in section 548(a)(1) cases of the witnesses examined on the intent issue.").[19] The court below found that Waxman, acting as president of River Bank and on behalf of Quest Equities (an insider of the debtor), controlled and dominated Basile and Kaufman, and used this control to hinder, delay and defraud FBN's creditors. FBN was insolvent and in dire financial circumstances during the settlement discussions, and both FBN and River Bank knew that it would be unable to satisfy all of its creditors. Although FBN

---

**19.** Appellant again seeks to avoid this deferential standard of review by arguing that (1) the court improperly imputed evidence of its fraudulent intent to FBN, and (2) as a matter of law, its actions could not have been construed as fraudulent. Both of these arguments lack merit. First, although River Bank cites several bankruptcy cases that focus solely on the intent of the transferor when analyzing the applicability of Section 548(a)(1), these cases do not preclude the imputation of the transferee's intent if the transferee controls or dominates the transferor. Indeed, this exception to the general rule is explicitly recognized in one of appellant's main cases, *Pinto v. Philadelphia Fresh Food Terminal Corp. (In re Pinto)*, 89 B.R. 486, 499 (Bankr.E.D.Pa.1988), *rev'd on other grounds*, 1989 WL 234516 (E.D.Pa. 1989). Second, River Bank maintains that a transferee's attempt to enforce its legal rights cannot be considered a fraudulent act of domina-

tion. However, the cases it cites in support of this assertion are inapposite. For example, *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir.1990), speaks only about whether certain acts permit a court to apply the doctrine of equitable subordination, not whether they subject the transferee to the law of fraudulent conveyance. Similarly, *In re Southern Land Title Corp.*, 474 F.2d 1033, 1038–39 (5th Cir.1973), simply held that under the facts of that case, the district court's finding of no actual intent to defraud was not clearly erroneous, in large part because there was no evidence that the insiders on the debtor's board of directors either proposed the transfer or voted for it. As discussed more fully below, the conduct of River Bank in the instant case was significantly more egregious than that of the transferee in *Southern Land Title*.

traded its claims for the benefit of the entire $4,175,000 paid out by Sizzler, FBN was forced to give $1.4 million of that benefit to River Bank. Waxman threatened Basile with the resurrection of a $100,000 promissory note that Quest Equities had previously forgiven if he did not approve this apportionment of the settlement proceeds. In addition, Kaufman (another insider of FBN) was under the control of Waxman since he had personally guaranteed some $9 million in loans from River Bank. Waxman's influence was also evidenced by his dictation of the written settlement agreement, and his attempts to extract more money out of FBN's principals in the so-called "side agreement" with SIG Partners. In exchange for agreeing to the $1.4 million transfer, FBN received little, if anything, of value. Indeed, rather than an arms-length transaction, River Bank extracted these funds from FBN's insiders by threatening their personal financial situation.[20] By exerting its influence over Basile and Kaufman individually, as well as FBN, appellant insured itself of a $1.4 million payment on the River Bank Loan, despite the fact that other creditors either had priority or should have shared pro rata in the assets of the estate.[21] Given all this evidence, and the great deal of deference given to the bankruptcy court's decision, we cannot conclude that the trial court committed reversible error in finding that actual fraudulent intent existed on the part of River Bank, and that such intent should be imputed to FBN.

### C. Constructive Intent to Defraud

The bankruptcy court also held that the $1.4 million transfer was voidable based on River Bank's and FBN's constructive intent to defraud FBN's creditors. The Code mandates a finding of constructive fraudulent intent when the debtor "receive[s] less than reasonably equivalent value in exchange for [the] transfer or obligation[,] and ... was insolvent on the date that such transfer was made or such obligation was incurred...." 11 U.S.C. § 548(a)(2). Although the parties do not dispute that FBN was insolvent at the time of the transfer, appellant challenges the bankruptcy court's finding that the debtor did not receive reasonably equivalent value in exchange. We give "great deference" to the bankruptcy court's determination on this fact-intensive issue. *Bundles v. Baker (In re Bundles)*, 856 F.2d 815, 825 (7th Cir.1988).[22]

River Bank argues that in exchange for the $1.4 million transfer, FBN received all the benefits of the settlement agreement, which included $250,000 in cash and the elimination of some $1.5 million in obligations owed by FBN. Such indirect benefits, appellant argues, must be considered when determining whether reasonably equivalent value was given to the debtor. *See In re Bowers–Siemon Chemicals Co.*, 139 B.R. at 444–45. However, the bankruptcy court found "no credible evidence" to support appellant's contention that the settlement agreement would not have gone forward without its approval. 175 B.R. at 689. Indeed, the court found that only after an agreement between FBN and Sizzler had been reached did the parties arrange for the disbursement of the $1.4 million to River Bank and Quest Equities. *Id.* River Bank also makes much of the fact that Sizzler requested Quest Equities and River Bank to attend the mediation and approve the settlement. However, the court below found that Sizzler was simply insuring

---

20. Appellant contends that its approval of the Sizzler settlement was the value it gave in exchange for the $1.4 million transfer. However, as discussed below, appellant's approval of the agreement was required because of Sizzler's belief that River Bank, as the sole owner of Quest Equities, was a principal of FBN. Thus, River Bank's contention that its approval constituted "value" worth approximately $1.4 million is questionable at best.

21. River Bank's fraudulent intent is further evidenced by its later reversal of the $1.4 million credit and transfer of its mortgage to ANB.

22. The Supreme Court recently rejected *Bundles* in the limited context of deciding whether the price paid at a regularly conducted, non-collusive foreclosure sale constituted "reasonably equivalent value." *See BFP v. Resolution Trust Corp.*, —— U.S. ——, ——–——, 114 S.Ct. 1757, 1760–65, 128 L.Ed.2d 556 (1994). However, *BFP* strictly limited its interpretation of "reasonably equivalent value" to mortgage foreclosure sales, *id.* at ——, 114 S.Ct. at 1765, and thus we do not read it as undermining the *Bundles* standard of review outside the mortgage foreclosure context.

itself that, before settling the FBN Litigation and the MRC Arbitration, it had all the potential principals of FBN and MRC on board. *Id.*

Moreover, the bankruptcy court found that the agreement to disburse the settlement funds was not reached by way of an arms-length transaction, but rather, through the coercion of the debtor by a major creditor. *Id.* The bankruptcy court heard the testimony of Basile, Gregory and Kaufman, and its findings on the nature of the settlement negotiations and the eventual disbursement of the proceeds were fairly supported by this evidence.

Finally, the court below found that FBN did not reap any benefit directly from the payment of $1.4 million to River Bank. These funds were initially credited to the River Bank Loan made to SFSA, an obligation on which FBN had no liability. *Id.* at 688–89. Although this credit could have reduced FBN's indebtedness to SFSA, this did not occur because the credit to SFSA was subsequently reversed and no amount of the SFSA loan made to FBN was forgiven.

In sum, the evidence supported the bankruptcy court's finding that FBN did not receive reasonably equivalent value in exchange for the $1.4 million payment to River Bank. We therefore defer to this finding and conclude that the trustee demonstrated constructive intent to defraud.

#### D. *Limitation on the Trustee's Recovery*

▮ Appellant's final argument is that the trustee should be precluded from recovering the entire $1.4 million payment because any such recovery is limited to the amount of timely filed claims against the estate of the debtor. River Bank goes on to argue that SFSA's claim of $2.4 million should be excluded on the grounds that it was untimely and would only benefit the insiders of the debtor. At bottom, River Bank seeks to challenge the bankruptcy court's approval of

SFSA's claim. However, the bankruptcy court previously held that River Bank did not have standing to object to this claim, and this ruling has been affirmed by Judge Conlon. *In re FBN Food Servs.*, No. 93 C 6347, 1995 WL 230958 (N.D.Ill. April 17, 1995). Under the law-of-the-case doctrine, once a court decides a legal issue then that decision is binding on the issue during future stages of the same case. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177–78, 100 L.Ed.2d 811 (1988). Because "the doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions," *id.* at 816, 108 S.Ct. at 2177, Judge Conlon's ruling on this issue should be binding upon us. Accordingly, we reject appellant's contention that the trustee should not be permitted to recover the entire $1.4 million.[23]

### III. Conclusion

For the reasons set forth above, the decision of the bankruptcy court is affirmed. It is so ordered.

---

**23.** In addition, we doubt whether River Bank is correct in its assertion that the trustee is limited in his recovery to the claims of the creditors. *See* 1995 WL 230958, at *3; 3 *Norton Bankruptcy Law and Practice 2d.* § 58:4, at 58–13 (1994) ("Under the Bankruptcy Code, however, it is

irrelevant if every creditor who has a claim against the debtor at the time of the transaction can be satisfied when the petition is filed."). However, we decline to expressly rule on the merits of this issue, and rely instead on the law-of-the-case doctrine.