UNITED STATES of America, Plaintiff,

v.

John V. KNOWLES, Defendant.

No. 98–CR–10.

United States District Court,
E.D. Wisconsin.

April 15, 1998.

---

Daniel Sanders, Ass't. U.S. Attorney, Milwaukee, WI, for Plaintiff.

Mark S. Stern, Stupar & Schuster, S.C., Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

· Before me is a Recommendation and Order issued on March 4, 1998, by the Honorable Aaron E. Goodstein, Magistrate Judge, recommending the following rulings on motions made by defendant John Vincent Knowles: (1) suppression of statements made by defendant on January 12, 1998; and (2) dismissal of the one-count indictment issued against defendant on January 21, 1998. The government filed timely objections to these recommendations, which are also before me. Having reviewed the Recommendation and objections *de novo*, I see no reason to depart from the factual and legal determinations made by Magistrate Judge Goodstein. Therefore, I will briefly respond to the objections, before adopting the Recommendation in full.

## I. Motion to Suppress

■ The Magistrate Judge has recommended that Knowles' confession be suppressed because it was not made voluntarily, given Agent Becker's numerous material misrepresentations regarding the defendant's status as a suspect and likelihood of arrest. Even if Knowles' *Miranda* rights were not violated (a conclusion which the court need not reach), his statements are inadmissible if made "involuntarily." *See, e.g., United States v. Erekson,* 70 F.3d 1153, 1157 (10th Cir.1995).

Voluntariness in this context depends on an assessment of "the totality of all the surrounding circumstances," including "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government has the burden to show by a preponderance of the evidence that the confession was voluntary, or "the product of a rational intellect and free will." *United States v. Carter,* 910 F.2d 1524, 1529 (7th Cir.1990) (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)). ·

The essence of the government's objection to the Magistrate Judge's recommendation to suppress is that a review of the "totality of the circumstances" does not suggest that the defendant's confession was involuntary. The government emphasizes several conclusions of fact made by the Magistrate Judge, relating to the non-custodial circumstances of the interview with Agent Becker and to the defendant's lack of susceptibility. The government also considers each "deception" in turn, arguing that none are particularly shocking or coercive.

■ This court, however, is persuaded that under a totality of the circumstances test the "pattern of deceptions" identified by Magistrate Judge Goodstein did, in fact, amount to impermissible coercion, in that the defendant was deprived of his ability to make a rational choice about whether to provide statements to Agent Becker. Throughout

the interview, Knowles was affirmatively led to believe that he was *not* going to be arrested and that he was *not* a suspect. In fact, Agent Becker had an arrest warrant for Knowles in his possession and had every intention of arresting him upon completion of the interview.

The irony of this fact situation is that the same facts which tend to undercut Knowles' argument that he was subject to "custodial interrogation" without the benefit of *Miranda* warnings—namely, that he believed he was not under suspicion and was free to go at all times—also bolster his claim that he was coerced by calculated police deception into making statements he would not have otherwise made, *i.e.*, that the statements were not "voluntary." As the parties have noted, the only relevant inquiry for *Miranda* purposes is "how a reasonable man in the suspect's shoes would have understood his situation." *United States v. James*, 113 F.3d 721, 726 (7th Cir.1997) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). But a reasonable person in Knowles' situation would have believed he was not in custody only because of the completely artificial context created by Agent Becker.

While state and federal authorities may have some latitude in being less than scrupulously honest in the interests of effective criminal investigation, here the pattern of deception appears to have been calculated to circumvent the need for *Miranda* protections and thereby to deprive the defendant of the ability to make a reasoned choice about whether to incriminate himself. As Magistrate Judge Goodstein observed, "The conduct of law enforcement in this case crossed over the line of tactical, yet proper, investigative work to governmental overreaching." Recommendation and Order (March 4, 1998) at 22.

In sum, I find that the record shows that Agent Becker affirmatively and repeatedly misled Knowles as to the true nature of the investigation, and that this misinformation was material to defendant's decision to make a confession on January 12, 1998. *See United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983) (setting forth standard for determining when deceit concerning nature of inquiry renders confession involuntary).

Consequently, Knowles' confession was not voluntary and is inadmissible under the Fifth Amendment's Due Process Clause. *Erekson*, 70 F.3d at 1157. Accordingly, defendant's motion to suppress is granted, and Knowles' statement is suppressed in its entirety.

## II. Motion to Dismiss

The Magistrate Judge has further recommended that Knowles' indictment be dismissed as too imprecise to enable the defendant to adequately prepare a defense or to protect him against future double jeopardy. The indictment reads:

> The Grand Jury Charges: From on or about January 1, 1996, and continuing to on or about October 3, 1997, within the State and Eastern District of Wisconsin, and elsewhere, John Vincent Knowles, Jr., the defendant herein, did knowingly conspire with other persons both known and unknown, to commit money laundering with the intent to promote the carrying on of drug trafficking. All in violation of Title 18, United States Code, §§ 1956(a)(1)(A) and (h) and 2.

At issue is the sufficiency of this language with respect to § 1956(a)(1)(A), which attaches criminal liability to a person who knowingly conducts or attempts to conduct a "financial transaction" with the proceeds of a "specified unlawful activity," with the intent to promote the continuation of that unlawful activity. Section 1956(h), also relevant, attaches criminal liability to a person who "conspires to commit" any offense in this section, including § 1956(a)(1)(a), paraphrased above.

*United States v. Allender*, 62 F.3d 909 (7th Cir.1995), states that an indictment is sufficient if it (1) states all the elements of the offense charged; (2) informs the defendant of the nature of the charge, enabling him to prepare a defense; and (3) enables the defendant to plead the judgment as a bar to later prosecution for the same offense. *Id.* at 914. *See also* Fed.R.Crim.P. 7(c)(1).

As the Magistrate Judge has noted, the present indictment merely replaces the term "financial transaction" with the ambiguous "money laundering," and identifies "drug

trafficking" as the "specified unlawful activity." A more specific definition of "financial transaction" is found at § 1956(4). But worse than not using this definition to specify the form of financial transaction in question, the government just alleges "money laundering," which, as it is colloquially understood, may be as broad as the statute itself, encompassing the entire range of § 1956 violations. Similarly, although § 1956(c)(7) lists broad categories of offenses which constitute "unlawful activities," the term "drug trafficking" is not squarely within any one category. As the Magistrate Judge has reasoned, the ambiguity of this indictment imperils both the defendant's ability to prepare a defense and his double jeopardy protection. Recommendation at 1140–1141.

The government's only objection to the Magistrate Judge's recommendation on this motion appears to be that the government does not have to allege *all* the elements of the underlying substantive offense or allege a specific "overt act" in order to satisfy the requirements of a conspiracy indictment, such as one under § 1956(h). *See, e.g., United States v. Shabani,* 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). However, as the government's own authorities indicate, the indictment must still clearly identify the offense that a defendant conspired to violate. *See United States v. Buschman,* 386 F.Supp. 822 (E.D.Wis.), *aff'd,* 527 F.2d 1082 (7th Cir. 1976). As the Magistrate Judge's analysis bears out, the present indictment fails to do this.

Further, the fact that an "overt act" does not have to be alleged is significant for the purpose of defining "conspiracy," but has nothing to do with whether the substantive offense has been clearly identified. In other words, the government cannot decline to identify the type of "financial transaction" and specific "unlawful activity" underlying the alleged conspiracy by simply claiming that the defendant was a conspirator, not an overt actor. Regardless, the defendant still needs to know what it is he is being charged with doing. *See United States v. Hinkle,* 637 F.2d 1154, 1158 (7th Cir.1981) (holding that indictment alleging "facilitation" of use of "controlled substances" was insufficient for not specifying *what* was facilitated and with *which* controlled substance).

For the above reasons, the defendant's motion to dismiss the indictment is granted, and this action is hereby dismissed.

**NOW, THEREFORE,** pursuant to the Recommendation of the United States Magistrate Judge,

**IT IS ORDERED** that the defendant's motion to dismiss is **GRANTED,** and the defendant's motion to suppress is **GRANTED.**

## RECOMMENDATION TO THE HONORABLE LYNN S. ADELMAN AND ORDER

GOODSTEIN, United States Magistrate Judge.

On January 21, 1998, a federal grand jury sitting in the Eastern District of Wisconsin issued a one-count indictment charging John Knowles with conspiring to commit money laundering with the intent to promote drug trafficking, contrary to 18 U.S.C. §§ 1956(a)(1)(A) and (h) and 2. Knowles was arraigned on January 22, 1998, before the Honorable William E. Callahan, Jr., and plead not guilty. A jury trial is scheduled to commence before the Honorable Lynn S. Adelman on March 23, 1998, with a final pretrial conference scheduled for March 13, 1998. Knowles filed four pretrial motions, which are fully briefed and ready for resolution.

### I. MOTION TO DISMISS

The defendant moves to dismiss the indictment, alleging that it fails to provide sufficient facts from which to base a defense and that it contains "open-ended" charges, contrary to Fed.R.Crim.P. 7(c)(1). The defendant also alleges that the indictment fails to provide a basis for determining whether the evidence offered to a petit jury is consistent with the evidence that was offered to the grand jury. Finally, the defendant contends that the indictment's vagueness enhances the likelihood that multiple conspiracies may be charged.

The indictment reads as follows:

The Grand Jury Charges: From on or about January 1, 1996, and continuing to

on or about October 3, 1997, within the State and Eastern District of Wisconsin, and elsewhere, John Vincent Knowles, Jr., the defendant herein, did knowingly conspire with other persons both known and unknown, to commit money laundering with the intent to promote the carrying on of drug trafficking. All in violation of Title 18, United States Code, § 1956(a)(1)(A) and (h) and 2.

Section 1956(a)(1)(A) states that whoever, knowing that property, involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of the specified unlawful activity with the intent to promote the carrying on of the unlawful activity, is guilty of money laundering. 18 U.S.C. § 1956(a)(1)(A). Section 1956(h) states that "[a]ny person who conspires to commit any offense defined in [§ 1956] … shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Title 18, section 2 only confirms that whoever commits an offense against the United States or willfully causes an offense to be committed against the United States shall be punished as a principal. Thus, this aspect of the indictment is not at issue.

■■■■ "An indictment is sufficient if it (1) states all the elements of the offense charged, (2) informs, the defendant of the nature of the charge, enabling the defendant to prepare a defense, and (3) enables the defendant to plead the judgment as a bar to later prosecution of the same offense." *United States v. Allender*, 62 F.3d 909, 914 (7th Cir.1995). Moreover, Fed.R.Crim.P. 7(c)(1) requires that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." " 'In reviewing the sufficiency of the indictment, a court should consider the challenged count as a whole and should refrain from reading it in a hypertechnical manner.' " *Allender* 62 F.3d at 914 (quoting *United States v. McNeese*, 901 F.2d 585, 602 (7th Cir.1990)). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitu-

tional standards." *Id.* It is generally sufficient that an indictment set forth the offense in the words of the statute itself—as long as the statutory language unambiguously sets out all the elements necessary to constitute the offense. *Id.*

Here, the indictment is defective because it does not unambiguously set out the elements of the offense; specifically, the elements that the defendant conspire to engage in a "financial transaction" representing the proceeds of a "specified unlawful activity." While a conspiracy charge under § 1956 allows the government to track the terms of the statute rather than allege an overt act, the indictment fails to even refer to the statutory language. Section 1956(4) defines "financial transaction" as a transaction affecting interstate or foreign commerce: 1) involving the movement of funds by wire or other means; 2) involving one or more monetary instruments; or 3) involving the transfer of title to any real property, vehicle, vessel or aircraft. A "financial transaction" also encompasses a transaction involving the use of a financial institution engaged in interstate or foreign commerce.

The indictment does not allege that the defendant engaged in a "financial transaction," let alone identify a specific form of "financial transaction." Rather, the government relies on a colloquialism—"money laundering"—a term fraught with ambiguity. *See* Black's Law Dictionary 884 (6th ed.1990) ("laundering" defined as "term used to describe investment or other transfer of money flowing from racketeering, drug transactions, and other illegal sources into legitimate channels so that its original source can be traced"). Because the indictment does not identify the specific form of financial transaction that the defendant allegedly conspired to commit, Knowles is deprived his ability to present an adequate defense and protect his right to be free from double jeopardy. For example, suppose the "money laundering" to which the government refers relates to depositing drug proceeds into a bank. Suppose further that, one year from today, the government again indicts Knowles for conspiring to commit money laundering, alleging that Knowles transferred drug proceeds by wire.

Because the current indictment is ambiguous, Knowles could not rely on the indictment to protect his double jeopardy rights. In this regard, the government submits that its "open file" discovery policy provides the defendant with extensive information about the offense. This may be so, but discovery cannot cure the lack of proper notice which is required from the indictment itself.

Moreover, the indictment alleges that Knowles conspired to commit money laundering with the intent to promote "drug trafficking." However, "drug trafficking" is not an offense listed as a "specified unlawful activity." Section 1956(c)(7)(A)–(F) provides six broad categories of offenses that constitute "specified unlawful activity." The court, and the defendant, are left to guess as to which category "drug trafficking" falls under because this term does not appear as a "specified unlawful activity." It may be that the government is alleging that the "specified unlawful activity" refers § 1956(c)(7)(A), covering acts or activities constituting an offense under the racketeering statute, 18 U.S.C. § 1961(1), which includes "dealing in a controlled substance." However, neither the court nor the defendant should be required to guess concerning the alleged underlying offense that constitutes the "specified unlawful activity." Again, the indictment's ambiguity in this regard does not allow Knowles to present an adequate defense and does not allow the defendant to protect his double jeopardy rights. Federal crimes and the Sentencing Guidelines establish substantial penalties; a defendant should not face this exposure by virtue of a short-hand method of charging. The court concludes that Knowles' motion to dismiss the indictment should be **granted.**

## II. MOTION TO COMPEL DISCOVERY AND MOTION FOR A BILL OF PARTICULARS

The defendant submits a laundry list of discovery material he seeks disclosed. The government indicates that it is following its "open file policy" discovery policy and that it has provided the defendant with all known material discoverable under the Federal Rules of Criminal Procedure. Simply as a matter of discovery, the government's "open file policy" and its response satisfies the defendant's permissible needs. The defendant's motion to compel discovery is denied.

With respect to the defendant's motion for a bill of particulars, the defendant is seeking evidentiary material which is not the proper purpose for a bill of particulars. In some cases, a bill of particulars can establish clarity to an otherwise barebones indictment. For example, the defendant can obtain the names of the "unindicted co-conspirators" referred to in an indictment as this information is necessary to clarify the parameters of the charged conspiracy. A bill of particulars cannot, however, be used to supply any essential missing elements of the offense; it cannot be used to cure a defective indictment. The motion is **denied.**

## III. MOTION TO SUPPRESS

### A. Background

The defendant seeks to suppress statements he provided federal law enforcement agents on January 12, 1998. The defendant contends that because he was subject to a "custodial interrogation," and the agents did not advise him of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the statements must be suppressed. On February 23, 1998, the court held an evidentiary hearing with regard to the defendant's motion to suppress. Testifying on behalf of the government was United States Customs Service Special Agent Robert Becker. The defendant offered limited testimony on his own behalf. Based on the testimony elicited at the hearing, the court makes the following findings of fact.

In April 1997, the Customs Service and the United States Drug Enforcement Agency ("DEA") commenced investigating the defendant and two other individuals for suspected drug trafficking and money laundering. In the late summer and autumn of 1997, Agent Becker unsuccessfully attempted to contact Knowles in Twin Lakes, Wisconsin— Knowles' last-known address. Through mail records and drivers license information, Becker traced the defendant to a residence in Mundelein, Illinois.

On October 22, 1997, a federal criminal complaint was filed against the defendant

and a warrant was issued for the defendant's arrest. On January 7, 1998, Becker proceeded to the Mundelein address, where he encountered George Savanne. Savanne told Becker that Knowles did not live at the residence and had not received mail at the residence for about one month. However, Savanne referred Becker to the defendant's father, who lives in Arizona. In an attempt to elicit information from Savanne about the defendant's whereabouts, Becker said that he possessed certain property of the defendant that he wished to return to Knowles. This was not true. Becker then left a business card with Savanne, advising him to pass it along to Knowles. The business card identified Becker as a special agent for the Customs Service and listed a Milwaukee telephone number as his place of contact. Becker later learned from Knowles that Savanne is Knowles' father-in-law.

On January 12, 1998, at about noon, Knowles telephoned Becker at Becker's Milwaukee office. Knowles, who telephoned from his Lake Villa, Illinois home, asked Becker whether he was in some sort of trouble, and Becker told him that he was not. This was not true. However, Becker told Knowles that he was aware that Franklin Clark and Stuart Whitehead approached Knowles about transporting marijuana from Texas to Illinois and Wisconsin. Becker asked Knowles if he would provide information about Clark and Whitehead at Becker's office in Milwaukee. Becker never told Knowles that a warrant had been issued for Knowles' arrest. Knowles agreed to talk to Becker and told Becker that he would be in Milwaukee as soon as he arranged for a ride.

Shortly after their conversation ended, Becker faxed a map to Knowles that contained directions to the Customs Service office in Milwaukee. About one-half hour later, Knowles telephoned Becker to tell him that he received the fax and that he would be in Milwaukee later that afternoon. Becker testified that Knowles was more inquisitive during the second conversation about any hidden motives on Becker's part, asking Becker whether he was going to be arrested. Again, Becker told him that he was not going to be arrested. Becker testified that he lied about this because he considered Knowles a fugitive and deception was necessary in order to persuade Knowles to come to Milwaukee.

Knowles received a ride from his friend, John Mooney, and the two arrived in Milwaukee between 2:30 and 3:30 p.m. on January 12. They proceeded to the Customs Service office, located in the third floor of a downtown Milwaukee office building, where they were met by Agent Becker. Becker testified that the office consists of a lobby and a "generic business office hallway" that leads to "generic business offices." In other words, the office does not appear to be a standard law enforcement office, according to Becker. Becker also testified that the door between the lobby and the outside hallway remains open during business hours, although a door between the lobby and the office hallway is locked.

Becker met Knowles in the lobby and asked Knowles' friend to stay in the lobby while he and Knowles talked in Becker's office. Becker told Knowles that he was being questioned as an "important witness" to Clark's and Whitehead's activities. Becker testified that Knowles did not ask whether he was going to be arrested and Becker did not provide this information. Becker also told Knowles that he was not in custody and that he was free to leave. This was not true since Becker testified at the hearing that, at this point in the interview, he was 99 percent sure he would arrest Knowles that day. In fact, Becker testified that had Knowles attempted to leave the premises, he would have been immediately arrested.

After approximately 15 minutes of questioning, a DEA Agent, who was working on the case with Becker, arrived in the office and observed the interview. The interview then proceeded for several more hours. During this time, Knowles was allowed to use the restroom and smoke a cigarette in the lobby. At about 5 p.m., Becker was told by Knowles' friend that he had to leave in order to pick up his wife in Illinois. Becker did not immediately relate this information to Knowles. Some time later, Becker told Knowles that his friend had to get back to Illinois and Knowles asked how he was to get back to Illinois. Becker told Knowles that he would drive him to Illinois if necessary.

However, Becker testified that he intended to arrest Knowles that day and not drive him to Illinois. Sometime during the interview, the fact that Knowles was wanted on an Illinois state probation violation arose. Agent Becker testified that he told Knowles that the charge was not extradictable and that as long as Knowles was not in Illinois, Becker was not going to act on the probation violation. Throughout the interview, Becker wore a gun on his right hip, which he said could have been exposed when he removed his jacket.

At about 5:30 p.m., the oral interview ended and Becker asked Knowles to reduce his statement to writing. Becker testified that he was careful not to tell Knowles that he was under arrest at this time. Knowles testified that when he reached the fourth page of his written statement, at line 10, he asked Becker whether he could leave. According to Knowles, Becker then displayed the arrest warrant that contained Knowles' name. Becker takes issue with Knowles' testimony by stating that he never showed Knowles the arrest warrant; rather, he showed him the cover page of the criminal complaint. According to Becker, he showed this document to Knowles in order to emphasize that the matter was taken seriously by the government. However, he did not tell the defendant that he was under arrest. In any event, Knowles provided no further written narrative of his prior oral statements. Instead, Becker transcribed a question and answer colloquy in which Knowles provided answers to Becker's written questions regarding the alleged criminal activity as well as the circumstances surrounding the interview.

At around 7:30 p.m., the interview ended and Becker advised Knowles to wait in the lobby while the agents decided on their next move. Becker testified that he ordered Knowles not to leave the office lobby and that the door to the outside hallway was alarmed. After about five minutes, Becker and the DEA agent placed Knowles under arrest and Knowles was transferred to the Waukesha County Jail. He made no further relevant statements.

Finally, Agent Becker testified that the Customs Service does not have an established policy with respect to the timing of executing arrest warrants. Becker said that he normally executes arrest warrants as soon as he comes in contact with a suspect, although he may delay executing a warrant to protect the identity of a confidential informant or for other tactical reasons. In this case, Becker said he delayed because Knowles was a fugitive.

Knowles testified that he was motivated to speak with Becker to assist the agents with apprehending Clark and Whitehead, both of whom had threatened Knowles. Knowles stated that he assumed throughout the interview that he would not be prosecuted if he cooperated. Knowles also testified that had he known he was going to be arrested, he would not have provided a statement.

## B. Analysis

Other than several minor factual disputes, the facts in this case are largely agreed upon. The parties agree that Knowles was subjected to interrogation and that he was not advised of his *Miranda* rights. Although the defendant admits that he felt free to leave during much of the interview, the defendant was in fact not free to leave the office. Agent Becker testified that had Knowles left, he would have been arrested. Knowles alleges three bases for suppressing his statement: 1) that he was denied his Sixth Amendment right to counsel because he was not afforded an attorney although an arrest warrant and criminal complaint had been lodged against him; 2) that he was denied his Fifth Amendment right to be free from compelled self-incrimination because he was subject to "custodial interrogation" without the benefit of *Miranda* warnings; 3) that the agents improperly delayed executing the arrest warrant; and 4) that his statement was involuntary under the Fifth Amendment's due process clause.

### 1. Sixth Amendment

The defendant initially contends that, because he was not afforded the opportunity to retain an attorney when he provided statements to law enforcement personnel, such statements should be suppressed because his Sixth Amendment right to counsel was violated. The Sixth Amendment right to counsel attaches when adversary judicial proceedings

are commenced "whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Here, although a warrant for the defendant's arrest was issued before he provided statements to Agent Becker, issuing a warrant is not an event that triggers the Sixth Amendment right to counsel. *See United States v. D'Anjou,* 16 F.3d 604, 608 (4th Cir.), *cert. denied,* 512 U.S. 1242, 114 S.Ct. 2754, 129 L.Ed.2d 871 (1994) (Sixth Amendment right to counsel did not attach where defendant questioned after arrest but prior to arraignment). Knowles provided statements to law enforcement officers prior to his formal arrest, let alone prior to his arraignment. Accordingly, the defendant's Sixth Amendment right to counsel was not violated.

### 2. Fifth Amendment

#### a. Was Knowles in "Custody?"

The defendant argues that because he was subjected to "custodial interrogation," the agents were required to advise Knowles of his *Miranda* rights. The parties do not dispute, and the court concurs, that Knowles underwent "interrogation" for *Miranda* purposes. Because the agents did not inform him of his rights, Knowles seeks to suppress all statements he provided to the agents on January 12, 1998. The government avers that because the defendant was not in "custody," for Fifth Amendment purposes, the agents were not required to provide *Miranda* warnings.

■■■ An officer's obligation to administer *Miranda* warnings only attaches "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). "Custody 'implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion.'" *United States v. James,* 113 F.3d 721, 726 (7th Cir.1997) (quoting *United States v. Martin,* 63 F.3d 1422, 1429 (7th Cir.1995)).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526. Thus, " 'the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation.' " *James,* 113 F.3d at 726 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

■■■ In the instant case, a reasonable person in Knowles' position would have felt free to end the conversation until Agent Becker flashed Knowles a copy of the complaint that contained Knowles' name. Agent Becker repeatedly told Knowles that he was not in trouble, that he was not under arrest, and that he was free to leave. Knowles acknowledges that he believed he was free to leave. To review, Becker told Knowles during their first telephone conversation that he was not in trouble and that he only wanted to talk with Knowles about Clark and Whitehead. During their second telephone conversation, Becker specifically told Knowles that he would not be arrested when he arrived in Milwaukee. When Knowles appeared at the Customs Office, Becker advised Knowles that he was an "important witness," not that he was a suspect. Becker also repeated that Knowles was not under arrest and that he was free to leave at any time. Moreover, the Customs Office does not contain the trappings commonly associated with a law enforcement agency, such as uniformed officers milling about or suspects contained in holding cells. Further, Knowles was allowed to smoke and use the restroom unaccompanied by the agents. Lastly, after the interview progressed and Becker asked Knowles to reduce his oral statement to writing, Becker again advised Knowles that he was not under arrest and that he was free to leave. The fact that Agent Becker viewed Knowles as a suspect is irrelevant because, at this point, he did not translate this fact to Knowles. *See Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526 (holding that police officer's subjective view that *individual under questioning is a suspect* is not relevant for determining whether suspect is in "custody" for *Miranda* purposes, unless officer's view is communicated to indi-

vidual). As the Supreme Court held in *Stansbury:*

> [A]n officer's view concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, *but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.*

*Id.* at 325, 114 S.Ct. 1526 (emphasis added).

Because Agent Becker did not communicate the fact that Knowles was the subject of an arrest warrant and criminal complaint, and Knowles otherwise would have felt that he was free to leave and under no compulsion to submit to questioning, Knowles was not in "custody" for purposes of the Fifth Amendment. *See United States v. Reynolds,* 762 F.2d 489, 493 (6th Cir.1985) (an unexpressed intent of a police officer to execute an arrest warrant does not convert an interview into a custodial interrogation).

■■■■ Once Knowles observed the criminal complaint bearing his name, a reasonable person would have believed that he was in "custody" for *Miranda* purposes. The facts surrounding how Knowles became aware that his name was listed on a charging document are disputed. Knowles states that he asked Becker whether he could leave, whereupon Becker showed him the arrest warrant containing his name, thereby indicating that Knowles was not free to leave. Becker states that he only displayed the front sheet of the criminal complaint to Knowles in order to convey to Knowles that a serious matter was at issue. The court need not resolve this factual dispute because, regardless of whose testimony is believed, a reasonable person under the attendant circumstances would not have felt free to leave the premises. Even under Becker's version of what transpired, Knowles saw a criminal complaint which named him as a defendant. At that point, a reasonable person would have known that he had been charged with a crime and that what Baker had previously represented to him was untrue. Surely, Becker's misrepresentations about being free to leave would have been highly suspect, and Knowles would have per-

ceived that he was in a custodial-like situation. Whether the document was an arrest warrant or a criminal complaint, a reasonable person would have been aware that he was a defendant and would not be free to leave the premises.

Further, it is instructive to ask why did Agent Becker wish to impress Knowles with the seriousness of the matter at this juncture in the conversation? Knowles' ride had left for Illinois and Knowles' future movement was entirely within Becker's control. Knowles' cooperative spirit was waning as he proceeded with his written statement, and he was considering leaving. Becker wanted Knowles to continue talking so he displayed the complaint to induce Knowles into talking, i.e., if Knowles did not cooperate, he would not be leaving. It is precisely this type of coercive conduct by law enforcement personnel that the Fifth Amendment prohibits and for which *Miranda* warnings are intended as a safeguard. Whether Knowles' entire statement should be suppressed or only the portion of his statement offered after the criminal complaint was displayed will be addressed subsequently in the discussion of the overall voluntariness of the defendant's statement.

**b. Did Agent Becker Improperly Delay Executing the Arrest Warrant?**

■■■■■ Knowles argues that his entire statement should be suppressed because the agents purposely delayed executing the arrest warrant in order to avoid informing him of the *Miranda* safeguards. Neither the Constitution nor the Federal Rules of Criminal Procedure require that an arrest warrant be executed within a fixed period of time. Moreover, "[t]here is no requirement that an arrest warrant be executed immediately after its issuance; rather, the general rule is that, while execution should not be unreasonably delayed, law enforcement officers have a reasonable time in which to execute a warrant and need not arrest at the first opportunity." *United States v. Drake,* 655 F.2d 1025, 1027 (10th Cir.1981). Delay in executing an arrest warrant may, however, be improper where government agents purposely delay execut-

ing the warrant to acquire a tactical advantage not otherwise attainable. *See id.*

Agent Becker testified that he did not immediately execute the arrest warrant when Knowles entered the Customs Service office because of Knowles' "fugitive status in Illinois." The relevance of Knowles' "fugitive status" in Illinois escapes the court. The only reasonable explanation for not executing the warrant once Knowles appeared is that Becker wanted to gather more evidence from Knowles; Becker wanted to interview Knowles before advising him of his *Miranda* rights; and that Becker wanted to interview Knowles while Knowles was under the impression that he was not going to be arrested—thereby eliciting a more detailed (and more incriminating?) statement.

The facts of this case are unique, as evinced by Agent Becker's testimony that he normally executes arrest warrants immediately. Neither the parties nor the court were able to discover cases directly on point. Most cases dealing with delay in executing arrest warrants arose from officers who delayed executing an arrest warrant in order to search premises "incident to arrest" for which a search warrant was not otherwise available. *See, e.g., McKnight v. United States,* 183 F.2d 977 (D.C.Cir.1950). For example, in *McKnight,* officers possessed an arrest warrant for the defendant but they did not have a warrant to search the defendant's residence. The officers observed the defendant on the street; however, they refrained from arresting him until he entered his residence in order to effectuate a search incident to the arrest. The court held that, because the arrest was a pretext for entering the residence in order to conduct a search for which a warrant was otherwise unavailable, the search was not valid. *Id.* at 978.

■ *Drake,* on the other hand, illustrates when officers may properly delay executing an arrest warrant in order to gain a tactical advantage. Fish and Wildlife Service agents possessed a warrant to arrest the defendant for illegally selling flamingos. Undercover agents approached the defendant's residence but, rather than immediately executing the arrest warrant, the agents assisted the defendant with capturing the flamingos and placing the birds in the officers' van. After purchasing the birds, the agents identified themselves and arrested the defendant. The defendant moved to suppress the flamingos as evidence, arguing that they were improperly seized without a search warrant. The court distinguished the facts from *McKnight,* noting that the officers did not delay executing the warrant to obtain evidence otherwise unavailable: "The agents apparently delayed service in order to strengthen their case and to obtain peaceful possession of the birds. The legal question is whether such a delay is, in and of itself, impermissible. We hold it is not when the evidence thus obtained could have been lawfully secured without the arrest warrant." *Drake,* 655 F.2d at 1027.

■ In the case at bar, while Agent Becker likely strengthened his case against Knowles by waiting to execute the arrest warrant until after Knowles provided his statement, Becker's tactic was not impermissible because the evidence obtained could have been lawfully gathered without the arrest warrant. If, for example, the complaint and arrest warrant had not issued, but Becker viewed Knowles as a suspect, he could have used identical tactics to get him to the office and elicit statements. Therefore, whether or not the warrant existed does not alter the fact that Knowles traveled to the Customs Office on his own accord and volunteered to speak with Agent Becker about the activities at issue. In other words, the arrest warrant was not necessary in order to obtain statements from Knowles. Thus, the agents did not gain a tactical advantage not otherwise obtainable by refraining from executing the arrest warrant.

**c. Was Knowles' Statement Voluntary?**

Lastly, Knowles seeks to suppress his entire statement because Agent Becker's repeated deceptions render the statement involuntary under the Fifth Amendment's Due Process Clause. Even if Knowles' *Miranda* rights were not violated, his statements are not admissible if they were made involuntarily. *See United States v. Erekson,* 70 F.3d 1153, 1157 (10th Cir.1995). "When determining the admissibility of a defendant's statements, voluntariness depends upon an assessment of 'the totality of all the surrounding circumstances,' including 'both the

characteristics of the defendant and the details of the interrogation.'" *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The government must prove by a preponderance of the evidence that a confession is voluntary. *See United States v. Carter,* 910 F.2d 1524, 1529 (7th Cir.1990). "That is, the government must establish that the confession was 'the product of a rational intellect and a free will.'" *Id.* (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)).

In the instant case, the physical setting of the interview was not particularly coercive because the Customs Office is located in an otherwise unremarkable office building, which does not contain the trappings associated with a typical law enforcement office. Knowles was allowed to leave Becker's office in order to use the restroom and to smoke a cigarette in the lobby. Although Agent Becker testified that his gun may have been displayed under his jacket, Knowles testified that he did not recall seeing a weapon or handcuffs on either Agent Becker or the DEA agent. Moreover, Knowles' does not contend that his intelligence or educational level rendered him particularly susceptible to coercive tactics. In fact, Knowles is experienced with the criminal justice system and is the subject of an outstanding parole violation with Illinois state authorities. Finally, the officers did not physically threaten Knowles nor did they offer him promises of leniency in exchange for his statement.

Nevertheless, the agents engaged in a pattern of deceptions. The evidence is undisputed that the agents committed the following misrepresentations: 1) Agent Becker told Knowles' father-in-law that he wanted to return property to Knowles when in fact he did not possess Knowles' property; 2) Agent Becker told Knowles by telephone that he was not in trouble and that he would not be arrested; 3) when Knowles arrived at Becker's office, Becker told Knowles that he was free to leave the office when in fact Becker would have arrested Knowles if he attempted to leave; 4) Becker told Knowles that he was being questioned as an "important witness," when in fact he had already been charged in a complaint; 5) Agent Becker did not initially advise Knowles his ride had left and then told him that he would drive Knowles to Illinois if necessary, when in fact Becker intended to arrest Knowles that day; and 6) when Agent Becker requested Knowles to reduce his oral statement to writing, Becker again told Knowles that he was not going to be arrested.

Given Agent Becker's material misrepresentations regarding whether Knowles would be arrested, Knowles' statement was not voluntary. Agent Becker's misrepresentations in effect amount to coercion because his deceptions deprived Knowles from making a rational choice about whether to provide a statement regarding the alleged offense. Moreover, Knowles was not provided a *Miranda* warning when the circumstances became custodial in nature.

Similar facts were at issue in *United States v. Swint,* 15 F.3d 286 (3d Cir.1994), where the defendant, Swint, was arrested on state drug charges. Swint and his attorney arranged to meet with the district attorney in order to cooperate with the investigation. Unbeknownst to Swint or his attorney, a federal DEA agent considered pressing federal charges against Swint and requested the district attorney to arrange for a meeting with Swint. Swint and his attorney proceeded to the district attorney's office, where it was understood that Swint would provide an off-the-record proffer in exchange for a negotiated plea on the outstanding state charges. During the meeting, federal agents confronted Swint with evidence of further drug activity, told him that federal authorities possessed a warrant for Swint's arrest and advised him that he should cooperate with the federal investigation. After consulting with his attorney, Swint agreed to make a statement and cooperate with federal agents, whereupon his attorney left the room. After his attorney excused himself, Swint made the inculpatory statements that were the subject of his appeal.

The district court granted Swint's motion to suppress such statements, holding that the statements were not voluntary. *See id.* at 288. The district court concluded that the government's "lack of candor led to substantial confusion regarding the implications of [Swint's] decision to cooperate and make a

statement to federal authorities,' and Swint's 'will was overborne to the extent that he made a statement that he would not have made had it not been for the misleading actions of the government.'" *Id.* (quoting *United States v. Swint,* Crim. No. 92–00286–02, at 20–21 n. 8 (M.D.Pa. April 28, 1993). The district court noted that the meeting was to be an informal, off-the-record discussion, it was common practice for the district attorney in Delaware County, Pennsylvania to hold such informal discussions with defendants seeking to cooperate in exchange for a plea agreement, neither Swint nor his attorney were informed beforehand that federal agents would attend the meeting or that federal charges were pending against Swint and neither the state nor federal agents informed Swint that Swint's statements to the federal agents were off the record. *See id.*

The Third Circuit affirmed the district court's order, concurring that the foregoing factors rendered Swint's statement involuntary. The appeals court cited additional factors supporting this conclusion: Swint was not provided *Miranda* warnings, Swint's attorney was not present when the statement was made, the statements were made in the district attorney's office, and the officers present were armed with their weapons visible. Of particular relevance to the present case, the court also noted that the deception engaged in by the federal authorities amounted to coercion:

> [T]he government's misleading conduct was coercive, and the coercive conduct caused Swint's confusion, depriving him of the ability to make a free and unconstrained choice about whether to make a statement to the federal agents. At the DEA's request, the state authorities drew Swint into the District Attorney's office on the assumption he would be making only off-the-record statements regarding pending state charges ... [T]he state and federal authorities used a coercive "bait and switch" technique, first by leading Swint and his attorney to believe Swint's statements would not be used against him and then by depriving Swint of that protection without giving him *Miranda* warnings.

*Id.* at 290–291.

In the instant case, Knowles was arguably subjected to a more coercive environment than Swint because Knowles did not have the benefit of counsel and Knowles, unlike Swint, was unaware that any charges were pending against him. However, in both cases, the government engaged in a "bait and switch" technique. Here, Agent Becker, in effect, led Knowles to believe that his statements would not be used against him because he was not going to be arrested and was only an important witness. Moreover, Becker deprived Knowles of this constitutional protection without providing him with *Miranda* warnings.

The government cites *United States v. Carter,* 910 F.2d 1524 (7th Cir.1990), for the proposition that an interrogator's false statements to a suspect do not render the suspect's statements involuntary. In *Carter,* the defendant moved to suppress his statements, claiming that they were not voluntary because they were induced by false threats to have his fiance charged if he did not cooperate. The district court made a factual finding that police did not threaten to charge the defendant's fiancé if he did not cooperate, which was not disturbed on appeal. *See Carter,* 910 F.2d at 1529. The district court also found that the police officer told the defendant that he did not know whether the defendant's fiancé would be charged when in fact he knew she would not be charged. On appeal, the court held that despite the "undercurrent of conceit," the defendant was not led to believe that his fiancé's fate depended upon whether he confessed in light of the trial court's finding that the defendant was not threatened with such a scenario. "Although [the police officer] did not eliminate defendant's fears that [his fiancé] might be charged, he also did not indicate that cooperation on defendant's part would exonerate [his fiancé]. A more probable interpretation is that defendant confessed with the hope of receiving lenient treatment for his cooperation." *Id.*

The Seventh Circuit's decision in *Carter* was based more on the factual circumstances, and the trial court's conclusion that the defendant was not in fact threatened with his fiancé's prosecution, than a general rule allowing police officers to engage in unlimited deception. Moreover, the *Carter* court ap-

pears to distinguish between passive misrepresentation (although the officer did not eliminate the defendant's fears that his fiance would be charged), with active misrepresentation (the officer did not indicate that cooperation would exonerate the defendant's fiancé). In the instant case, by contrast, the facts present more than an undercurrent of deceit. While this was not a *Mission Impossible* scenario with an elaborate hoax, Agent Becker engaged in active misrepresentation when he told the defendant that he was an important witness and when he told the defendant that he was free to leave and would not be arrested. Becker created an artificial environment which he believed would maximize his ability to elicit the defendant's cooperation. The conduct of law enforcement in this case crossed over the line of tactical, yet proper, investigative work to governmental overreaching.

The court therefore concludes that the government fails to establish by a preponderance of evidence that Knowles' statement was the product of a rational intellect and a free will and therefore voluntary. Based on the totality of circumstances, Knowles' statement was not made voluntarily and the entire statement should be suppressed. Although Knowles voluntarily agreed to come to Milwaukee in order to assist investigators and the environment in which Knowles offered his statement was not overtly coercive, Knowles' will was overborne because he was repeatedly assured that he was not a suspect and that he would not be arrested when in fact he was a defendant and the agents possessed a warrant for his arrest.

Parenthetically, there exists a substantial likelihood that Knowles would have cooperated had the agents not resorted to their deceptive tactics. This court has conducted innumerable evidentiary hearings involving challenges to the voluntariness of a defendant's statements. Although this is only anecdotal evidence, what is most interesting from a law-enforcement standpoint, is that a large majority of the statements were provided while the defendant was in custody and after he or she had received advice of rights pursuant to *Miranda*. The defendant's custodial status did not adversely affect the defendant's willingness to provide a statement, because in each case, the defendant either wanted to "come clean" or felt that cooperation would be beneficial. In other words, an arrest and custody does not automatically handcuff law enforcement agents. They retain sufficient leverage and legitimate incentives to obtain cooperation from defendants at the pre-indictment stage. Had Knowles been placed under arrest when he appeared at the Milwaukee office and been apprised of the true nature of his situation, he may have still cooperated. However, he was not given the chance, but instead was subjected to excessive and impermissible deception in order to obtain his statement.

To summarize, the court finds that Knowles was not initially subjected to custodial interrogation when he provided his oral and then written statements to Agent Becker. However, the court concludes that the circumstances evolved into "custodial interrogation" at and after the time that Knowles was made aware of the criminal complaint against him. Notwithstanding, the court recommends suppressing Knowles' entire statement, because it was not made voluntarily. The court therefore recommends granting the defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that:

1. The defendant's motion to compel discovery is **denied.**

2. The defendant's motion for a bill of particulars is **denied.**

**IT IS THEREFORE RECOMMENDED** that:

1. The defendant's motion to dismiss be **granted.**

2. The defendant's motion to suppress be **granted.**

The Clerk of Court is directed to transfer this case to Judge Adelman for further proceedings. In accordance with Local Rule 13.03, any objections to this recommendation and order must be filed in writing with the Clerk of Court no later than **March 13, 1998,** the date of the final pretrial conference.

Dated at Milwaukee, Wisconsin this 4th day of March, 1998.